IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES,

      Plaintiff,

v.                                                                                  No. 2:19-cr-02176-RB-1

JOSEPH MONTES,

      Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Law enforcement officers must strike the right balance between security and privacy, all within the Fourth Amendment's prohibition of unlawful searches and seizures. On May 14, 2019, police officers approached Defendant Joseph Montes and another individual after witnessing them bang on metal bins outside a hotel room. Montes explained that they were panning for gold, voluntarily showing the officers bags in the trunk of his car and even inviting them into his hotel room. But after several minutes of questioning, Montes refused to turn over his guitar case. The officers sought a search warrant and eventually seized the case, which held more than 500 grams of methamphetamine. Montes filed a Motion to Suppress (Doc. 21) the physical evidence recovered at the scene. Considering that the officers misrepresented their authority to seize the guitar case and included the fruits of an illegal search in the warrant affidavit, the Court will grant Montes's Motion to Suppress.

## FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that "when factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). Montes was charged with violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) for possession

with intent to distribute more than 500 grams of methamphetamine. He filed this Motion to Suppress Evidence on October 15, 2019 (Doc. 21). At hearings on January 7, 2020 and January 14, 2020, the Court heard testimony from Sergeant Timothy Tavizon and Agent Richard Flores. Based on the hearing and the record, the Court makes the following findings of fact:

1. Agent Flores received information about Montes from confidential informants prior to the May 14, 2019 encounter with police, but this information was dated and never acted upon. (Doc. 60 (Tr.) 193:12–23.)

2. In addition, Alex Padilla—the father of Montes's deceased wife—contacted the Silver City Police Department in April 2019 to share information about Montes's illicit activities. (Tr. 128:15–18.)

3. Padilla shared that Montes sold methamphetamine out of the Gila Mountain Inn (Inn); he drives a gray Nissan Altima; and he visited Silver City, NM about once a month. (Tr. 130:1–22.)

4. Flores then observed Montes and his vehicle at the Inn in April 2019. (Tr. 131:6–14.)

5. On May 14, 2019, Flores saw Montes's vehicle at the Inn again, and outside of the room Montes and another individual were "banging on a metal container" that "appeared to contain some type of unknown contents." (Tr. 132:18–25.)

6. Flores called Sergeant Tavizon to tell him he was at the Inn watching Montes. He had previously briefed Tavizon, and Flores shared the peculiar behavior he was observing. (Tr. 134:1–7.)

7. At approximately 5:30 PM, Tavizon and another officer approached Room 126 where Montes was staying. (Tr. 22:3–11.)

8. Agent Flores was parked in a lot about 100 yards from the Inn. (Tr. 132:4–11.)

9. Tavizon knocked and announced his presence, and Montes opened the door. (Gov't Ex. 1 at 17:38:58.)[1]

10. Montes explained that he and his friend were panning for gold, and he invited the officers into the room to view their equipment. (*Id.* at 17:39:05.)

11. Tavizon questioned Montes about his nickname "Horse," before asking why "people say [he] sell[s] a lot of drugs." (*Id.* at 17:42:50–17:43:15.)

12. Montes explained that his wife's family accused him of dealing drugs. (*Id.* at 17:43:15–17:43:25.)

13. Tavizon then asked Montes whether he could search his vehicle, and Montes agreed. (*Id.* at 17:43:25.)

14. Montes largely directed this search, showing Tavizon various items in his trunk. (*Id.* at 17:43:1—17:47:15.)

15. Montes irritably stated that he did not have to show him anything, and Tavizon confirmed that the search was voluntary. (*Id.* at 17:47:03.)

16. After looking through the trunk, Tavizon asked to do a walk-through of the hotel room and Montes complied. (*Id.* at 17:48:05.)

17. On entering the room, Montes picked up his guitar case and held what appeared to be the guitar's neck out for Tavizon to touch. (*Id.* at 17:48:12.)

18. At this time, Tavizon noticed a bulge in the front pouch of the case. (*Id.* at 17:48:12–17:48:35.)

19. He asked Montes about it, and Montes claimed that it was an effects pedal for his guitar. (*Id.* at 17:48:25.)

---

[1] Given that there are three media files that comprise the entire bodycam footage, the Court cites the time stamp (May 14, 2019 MT) from the bodycam, instead of the time listed on the media file for ease of reference.

20. Tavizon asked if he could search the entire guitar case, and Montes refused. (*Id.* at 17:48:40.)

21. Tavizon then explained that he would seek a warrant to search the case. (*Id.* at 17:48:35.)

22. Not wanting Montes left alone with potential evidence for fear of destruction, (Tr. 36:9–18), the officers sought to seize the case in preparation for a search warrant (Tr. 122:6–15).

23. Flores claimed that the decision to seize the case instead of merely securing the room was based on a shortage of manpower. (Tr. 154:12–25.)

24. Tavizon called Flores and explained his justification for probable cause to search the case; though, his body camera was off during this interaction. (Tr. 122:6–15.)

25. Relaying this information, Flores phoned the on-call assistant district attorney (ADA) to confirm that they were seeking a warrant. (Tr. 203:1–22.)

26. Tavizon then told Montes that the "other agent who called the [ADA] wants us to take the guitar." (Gov't Ex. 1 at 17:58:57–17:59:05.)

27. At one point, an officer stated that the ADA "approved" the warrant. (*Id.* at 17:59:37.)

28. In addition, an officer claimed that the ADA gave them authority to seize the case. (*Id.* at 18:00:05.)

29. The officers continued to insist that Montes would be arrested if he did not turn over the guitar. (*Id.* at 17:59:20.)

30. After multiple warnings, the officers arrested Montes for resisting, evading or obstructing an officer. (*Id.* at 18:04:25.)

31. Once arrested, Flores seized the guitar case from the room and sealed the exterior pouch with evidence tape. (Tr. 156:3–25.)

32. Flores claimed to have accidentally felt the outside of the case and determined that the contents were "crunchy," which he included in the affidavit for the search warrant. (Tr. 228:2–19.)

33. Flores then transported the case to the Silver City Police Department. (Tr. 229:18–24.)

34. Judge Hofacket approved the May 14, 2019 warrant at approximately 8:29 PM. (Gov't Ex. 2.)

35. The officers then performed a search of the case at approximately 8:55 PM and found a crystal-like substance that tested positive for methamphetamine. (Tr. 166:4–8.)

36. Judge Jim Foy approved a second warrant at 12:00 PM on May 15, 2019 to search Montes's phone. (Gov't Ex. 3.)

**CONCLUSIONS OF LAW**

**I.    Montes consented to Sergeant Tavizon searching his car and hotel room, but not his guitar case.**

Officers need to make "reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Illinois v. McArthur*, 531 U.S. 326, 332 (2001). Generally, a warrantless search is unlawful, but a few exceptions exist to justify such searches. *United States v. Zogmaister*, 90 F. App'x 325, 329 (10th Cir. 2004) (citation omitted). For instance, a defendant can voluntarily allow officers to search or seize property, *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), but the burden rests with the government to prove that this exception exists, *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011). Such voluntariness is determined by a totality of the circumstances, *id.*, and the scope of consent is measured by what a reasonable person would think in the context of his exchange with officers, *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004); *see also United States v. Harrison*, 639 F.3d 1273, 1277–78 (10th Cir. 2011) (arguing that consent cannot be coerced); *United States v. Anderson*, 114 F.3d

1059, 1065 (10th Cir. 1997) ("The scope of a search is generally defined by its expressed object and is limited by the breadth of the consent given.").

In this case, Montes consented to the police questioning at the outset of the interaction. After Tavizon knocked on the door, Montes cheerfully answered and willingly showed the officers his gold panning equipment inside the hotel room. They continued their conversation outside, and Tavizon asked if he could search Montes's vehicle. Tavizon allowed Montes to direct the search; though he repeatedly asked Montes to open various items in his trunk. Growing frustrated with the officer's questions, Montes claimed that he should not have to show the officer his bags. Tavizon confirmed this and provided Montes with an opportunity to end the interaction, but Montes continued to voluntarily open bags. Tavizon was persistent throughout the exchange but not so forceful to cause a Fourth Amendment violation. Thus, throughout the car search and the initial search of the hotel room, Montes consented. Nevertheless, once the officer asked to see the guitar case, Montes refused. At this point, consent no longer existed, and a warrant was required.

**II.     The government did not meet its burden to show that exigent circumstances existed.**

The Supreme Court has held that "police officers need either a warrant or probable cause plus exigent circumstances to make a lawful entry into a home." *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002). Again, the burden rests with the government to prove that exigent circumstances rendered a warrantless search reasonable. *Martinez*, 643 F.3d at 1296. Exigency requires that the "needs of law enforcement [are] so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). Courts view exigent circumstances on a case-by-case basis through the lens of a reasonable officer. *United States v. Ramirez-Fragozo*, 490 F. App'x 125, 127 (10th Cir. 2012).

A legitimate fear certainly existed that Montes would dispose of drugs prior to the police receiving a search warrant. But until the seizure and search, there was no factual basis to conclude that any drugs existed on the premises, nor was there any evidence that it was likely to be destroyed.[2] During testimony, neither officer stated that any exigency existed. Instead, they wholly relied on manpower needs to justify the warrantless search. (*See* Doc. 68 at 9.) Even if that were the reason, the officers produced no evidence that there was in fact a manpower shortage, or that the problem precluded sealing the room some other way. Given that much of the government's argument is speculative, it did not meet its burden of proving that exigent circumstances existed.

### III. The officers' warrantless seizure of the guitar case violated the Fourth Amendment.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable *searches and seizures*." U.S. Const. amend. IV (emphasis added). This right is strongest when the home is the subject of a search. *See Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018). And hotel rooms receive this same constitutional treatment. *Stoner v. California*, 376 U.S. 483, 489 (1964); *see also Zogmaister*, 90 F. App'x at 328 (holding that "it is beyond dispute that individuals residing in motel rooms generally have a reasonable expectation of privacy and thus receive Fourth Amendment protection." (citation omitted)).

The Fourth Amendment treats searches and seizures equally—with both requiring a warrant. *See* Const. amend. IV. The Supreme Court has held that the seizure of personal property is "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *See United States v. Place*, 462 U.S. 696, 701 (1983). Officers may, however, seize property prior to a warrant to protect evidence when probable cause exists. *See Harman v. Pollack*,

---

[2] *See* sections IV and V regarding probable cause.

586 F.3d 1254, 1266 (10th Cir. 2009). Historically, pre-warrant seizures are seen when officers suspect that a defendant's car holds contraband, *United States v. Brown*, 24 F.3d 1223 (10th Cir. 1994), but personal property may be seized for the purpose of obtaining a warrant when the facts create "more than a mere suspicion of criminal activity and would [lead] a reasonable person to believe there were illegal drugs [in the seized item]," *United States v. Munoz-Nava*, No. CR-05-99 MV, 2005 WL 8163368, at *12 (D.N.M. Oct. 27, 2005) (seizing boots suspected of containing drugs).

Here, there is no question that the guitar case was seized without a warrant. While the officers may have been in the process of obtaining one, none existed at the time of the seizure. Further, the officers on the scene misrepresented the process, telling Montes that the ADA had already approved the seizure. It might be common practice in a police department to first phone the district attorney's office to share facts and garner a first-impression opinion about whether a warrant will receive approval—in fact, such a practice is encouraged. Confirming with the ADA ensures that multiple perspectives are included to obtain the warrant. Misrepresenting this process, however, is not allowed. The ADA can provide an opinion about whether a judge will approve a warrant, but he or she in no way has the authority to grant or deny warrants. That power rests with judges alone. Thus, while heartened by the officer's call to the ADA, the Court is dismayed by the fact that officers told Montes the ADA granted them authority to seize the guitar. The Constitution does not endorse this arrangement, and the officers' actions tainted this process. Thus, with no warrant, the seizure is unconstitutional.

**IV.    No probable cause existed to obtain the warrant.**

Probable cause requires under a totality of the circumstances that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v.*

*Grimmett*, 439 F.3d 1263, 1270 (10th Cir. 2006) (internal quotation marks omitted) (quoting *United States v. Simpson*, 152 F.3d 1241, 1246 (10th Cir. 1998)). The validity of a warrant is based on the information that the officers possessed and disclosed. *See Maryland v. Garrison*, 480 U.S. 79, 85 (1987). Courts cannot simply find probable cause "by piling hunch upon hunch" or ignoring evidence that works against it. *See United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

The affidavit relied on a few key facts: (i) information from confidential informants; (ii) information provided from Padilla; (iii) Montes's heightened nervousness; and (iv) the "crunchy" feel of the guitar pouch. Each proved problematic. First, the information from the confidential informants was described as "stagnant." The information was a year or more old, and Flores admitted that he was no longer following the Montes lead. In fact, he stated that he "relied more on the most current information" in filling out the affidavit. (Tr. 193:3–5.) He later stated that the confidential source information was intended only to provide context and that the department does not, in practice, use "stagnant" information in search warrants. (Tr. 194:7–9.) Therefore, while the confidential information may have initially familiarized police to Montes, none of it appeared relevant to the facts at hand.

Next, the officer relied on the information that Padilla provided. Padilla reached out directly to the department to share information that Montes was selling methamphetamine. This information, however, proved highly conclusory. Padilla shared that Montes (a) stayed at a hotel in the vicinity of his children, whom he visited once per month, and (b) drove a Nissan Altima. These two facts have nothing to do with the drug trade and are consistent with perfectly innocent behavior. Padilla provided no facts that link Montes with any drug manufacturing, transportation,

or transactions. Thus, Padilla's information gets the officers no closer to establishing probable cause.

Regarding nervousness, the Tenth Circuit holds that it alone does not create probable cause. *United States v. Salais-Perea*, 185 F.3d 875, at *2 n.1 (10th Cir. 1999) (citation omitted). Montes's nervous behavior increased as the encounter with police progressed. At first, Montes was pleasant and cooperative, showing Tavizon the trunk of his vehicle, but Montes became frustrated when Tavizon asked to see the guitar case. On the one hand, it is reasonable that Montes grew agitated as the officers continued fishing for incriminating evidence. On the other hand, Montes largely directed the officers in their search to avoid stumbling upon illicit material, and when he knew officers were closing in on the drugs, he grew angry. Nevertheless, this latter understanding only comes with the benefit of hindsight and the knowledge that drugs were eventually found. Until then, Montes appeared cooperative, having voluntarily opened several bags in his trunk. Standing alone, however, any nervousness that Montes allegedly exhibited has little value. And finally, as discussed in more detail in the next section, Flores feeling the pouch constituted an illegal search.

V. **The warrantless search of the guitar case violated the Fourth Amendment, and it should not have been included in the warrant affidavit.**

Flores illegally searched the guitar case without a warrant when he taped over the front pouch. Searches are unconstitutional when an individual's expectation of privacy is violated. *Katz v. United States*, 389 U.S. 347, 361 (1967). While individuals have an expectation of privacy in their personal belongings, "[n]ot every investigative technique which reveals something about the contents of a traveler's luggage constitutes a search . . . ." *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998). For instance, a dog sniff for drugs, *United States v. Place*, 462 U.S. 696, 707 (1983), or an officer detecting an odor do not constitute Fourth Amendment searches, *United States v. Burns*, 624 F.2d 95, 101 (10th Cir. 1980). Moreover, in *United States v. Gault*, the Tenth

Circuit held that when an officer kicked a train passenger's bag, he gathered "the same information that a passenger would have obtained by kicking the bag accidentally . . . ." 92 F.3d 990, 992 (10th Cir. 1996). What matters for purposes of the Fourth Amendment, however, is the degree of intrusion. *Nicholson*, 144 F.3d at 639. When an officer touches a bag in such a way that manipulates it to "reveal[] the contents," it constitutes an illegal search. *Nicholson*, 144 F.3d at 639.

While placing evidence tape on the bag, Flores felt the same outside pouch that prompted Tavizon's initial suspicions about the case. Moving bags in crowded public places may result in incidental touching. But in this instance, the officers seized the case and had no reason to feel the bag other than to confirm a suspicion he held. *Nicholson* ruled that "[u]nlike a sniff, manipulating a bag with the hands may reveal much more than simply the likely presence of illegal drugs." 144 F.3d at 639. Here, Flores put the evidence tape on the pouch precisely because it allowed him to feel the contents. There was no reason to tape the pouch because the guitar stayed in Flores's possession until the search. Even more problematic, Flores then included information about his intrusive tactile search in the warrant affidavit—describing the pouch of the case as "crunchy" and not like a pedal. The judge approved the warrant, but this information never should have been considered. Its inclusion cast further doubt on the efficacy of this entire encounter. And together, sections IV and V show that the officers lacked probable cause to search the guitar case.

**VI.   The inevitable discovery doctrine did not justify the Fourth Amendment violations.**

The government also contends that the inevitable discovery doctrine applies in this matter. The inevitable discovery doctrine states that illegally obtained evidence should be admitted if it "inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984) (footnote omitted). And the government bears the burden of proving that this evidence

would have been discovered eventually. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005); *see also United States v. Souza*, 223 F.3d 1197, 1200 (10th Cir. 2000) (same). This often occurs when an independent investigation would have produced the evidence regardless, or the officers took steps to obtain a warrant. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

Unlike *Cunningham* where the search was contested after the fact, Montes refused to let the officers search the case at the time. The *Cunningham* court also stated that the officers would have gotten a warrant had the defendant not consented. 413 F.3d at 1202. And *Souza* likewise held that the officers would have sought a warrant if the illegal search had not occurred. 223 F.3d at 1200. But here, Flores did seek a warrant for the guitar case; it was however a defective warrant. It was obtained through information that was: stale (confidential informants); seemingly innocent (Padilla); and the product of an illegal search (Flores's tactile search). Additionally, the officers misrepresented the process to Montes when they claimed that the ADA approved the seizure. The inevitable discovery doctrine applies when officers prematurely search but would have gone through the proper channels with more time, not when they attempt to go through such channels but lack justification to do so. As a result, this doctrine does not apply to these circumstances.

**THEREFORE,**

**IT IS ORDERED** that Montes's Motion to Suppress Physical Evidence (Doc. 21) is **GRANTED**.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**